IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NEFTALI VELAZQUEZ,<br><br>   *Plaintiff,*<br><br> v.<br><br>CITY OF PHILADELPHIA, et al.,<br><br>   *Defendants.* | CIVIL ACTION<br>NO. 25-3720 |

**Pappert, J.**                               **January 12, 2026**

## MEMORANDUM

  In January of 2016, a Pennsylvania state jury convicted Neftali Velazquez for killing Domingo Rivera and possessing an instrument of crime. Six years later, the Philadelphia County Court of Common Pleas vacated Velazquez's convictions and dismissed all charges against him, finding the prosecution failed to turn over certain information to the defense.

  After his release, Velazquez filed this lawsuit under 42 U.S.C. § 1983 against the City of Philadelphia, the Philadelphia District Attorney's Office, Assistant District Attorney Nicholas Liermann and nine detectives: William Holmes, Philip Nordo, Thomas Gaul, John Verrecchio, Thorsten Lucke, William Sierra, Tracy Byard, Robert Wilkins and James Clark. He asserts claims under the United States Constitution, as well as related tort claims under Pennsylvania law.

  Eight detectives—Holmes, Gaul, Verrecchio, Lucke, Sierra, Byard, Wilkins and Clark—now move to dismiss the claims asserted against them in Velazquez's Amended

1

Complaint.[1]  The Court grants their motion in part, denies it in part and allows Velazquez to file a second amended complaint.

I

Shortly before eleven o'clock on the night of October 17, 2012, someone shot and killed Domingo Rivera in front of a bar in West Kensington, Philadelphia.  (Am. Compl. ¶ 20, Dkt. No. 12.)  As Philadelphia detectives investigated the killing, they interviewed three key witnesses—Rafael Rodriquez, Jonathon Rodriquez and Wendy Quiles—each of whom said Velazquez killed Rivera.  (*Id.* ¶¶ 27, 30.)  Velazquez alleges, however, the detectives fabricated their statements, leading to his prosecution without probable cause.  (*Id.* ¶¶ 28, 30.)

A little over a week after Rivera was killed, a police officer arrested Rafael Rodriquez, who had two open bench warrants for drug violations.  (*Id.* ¶ 31.)  Rafael wanted the police to help him with his cases, (*id.* ¶ 32), so he told the officer he had witnessed Rivera's murder, (*id.* ¶ 33).  He said he was with a man named Jonathon Rodriquez at the bar where Rivera was killed and that he saw another man named "Nesty" kill Rivera.  (*Id.*)

After learning this, the officer took Rafael to homicide detectives.  (*Id.* ¶ 34.) Sierra interviewed Rafael under Holmes's supervision.  (*Id.* ¶ 35.)  Sierra told Rafael that Velazquez was the shooter and showed Rafael a picture of Velazquez.  (*Id.* ¶ 36.) Rafael replied that he didn't know Velazquez and had never seen him.  (*Id.*)  Rafael said the shooter was someone other than Velazquez.  (*Id.*)  At this point, Sierra allegedly

---

[1] Velazquez filed his original Complaint on July 20, 2025.  (Compl., Dkt. No. 1.)  After eight of the detectives moved for judgment on the pleadings in October, he amended his Complaint as a matter of right.  (Order, Oct. 21, 2025 at 1, Dkt. No. 15.)

offered to help Velazquez with his open drug cases if he would identify Velazquez as the shooter. (*Id.*) Rafael agreed. (*Id.*)

The detectives next sought to speak with Jonathon, who was allegedly at the bar with Rafael at the time of the shooting. (*Id.* ¶ 47.) Nordo arrested Jonathon, falsely telling him he was being detained for a probation violation. (*Id.* ¶ 51.) Gaul and Verrecchio interviewed Jonathon, who said he didn't see who shot and killed Rivera. (*Id.* ¶ 56.) Gaul and Verrecchio then allegedly told Jonathon that if he did not identify Velazquez, they would charge him with Rivera's murder. (*Id.* ¶ 57.) They said Jonathon could not leave the station until he identified Velazquez. (*Id.*) Following this, Jonathon signed a statement identifying Velazquez as Rivera's killer. (*Id.* ¶ 59.)

Soon after Rivera's killing, the police also interviewed a woman named Wendy Quiles. She was smoking with Rivera outside the bar when he was killed, but she couldn't see his killer because it was too dark. (*Id.* ¶ 62.) She gave a generic description of the shooter, emphasizing she didn't see his face. (*Id.* ¶ 64.) Then, in January of 2013, after Rafael and Jonathon had identified Velazquez as the shooter, detectives questioned Quiles again. (*Id.* ¶ 65.) Byard and Lucke interviewed her. (*Id.* ¶ 66.) She again said she didn't see the shooter because it was too dark. (*Id.* ¶ 67.) Byard and Lucke then showed Quiles a set of photographs—which included a picture of Velazquez—and told her to identify one of the photos as the killer. (*Id.* ¶ 68.) Quiles never actually identified Velazquez as the shooter; the officers forced her to sign his photo. (*Id.* ¶¶ 68, 90.)

In March of 2013, Wilkins presented the statements by Rafael, Jonathon and Quiles to the chief of the homicide unit at the District Attorney's Office, who instructed

Wilkins to seek an arrest warrant. (*Id.* ¶ 70.) Gaul signed an affidavit of probable cause predicated solely on Jonathon's statement identifying Velazquez as the shooter. (*Id.* ¶ 72.) A magistrate judge issued a warrant and Velazquez was arrested in April of 2013. (*Id.* ¶¶ 76, 77.) At trial, the prosecution relied on the statements by Rafael, Jonathon and Quiles. (*Id.* ¶ 85.) Each of these witnesses, however, recanted on the stand and said their identifications of Velazquez were fabricated. (*Id.* ¶ 87.)

On January 25, 2016, the jury convicted Velazquez of first-degree murder and possessing an instrument of crime. (*Id.* ¶ 115.) He was sentenced to life in prison. (*Id.*) Six years later, the Common Pleas Court vacated Velazquez's sentence and ordered a new trial, finding the prosecution failed to turn over various information to the defense. (*Id.* ¶ 119.) The District Attorney's Office then moved to dismiss Velazquez's case, and the Court of Common Pleas granted the motion. (*Id.* ¶ 123.)

Velazquez now asserts Sierra, Gaul, Verrecchio, Byard, Lucke, Holmes, Wilkins and Clark (1) fabricated evidence, (2) withheld evidence from his defense, (3) maliciously prosecuted him and (4) conspired to violate his civil rights. He also seeks to hold Wilkins and Clark liable under a theory of supervisory liability.

## II

The Court assesses the sufficiency of a pleading before discovery under Federal Civil Rules 8 and 12. Rule 8(a)(2) provides that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). And Rule 12(b)(6) permits a district court to dismiss a complaint that fails "to state a claim upon which relief can be granted." *Id.* 12(b)(6). Taken together, the two rules require the plaintiff to allege sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The first

step in determining whether a plaintiff has stated a plausible claim is to "tak[e] note of the elements" underlying his claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129–30 (3d Cir. 2010). The next step is to examine the plaintiff's complaint and determine whether the factual allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

Plausibility requires the plaintiff to plead sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The reasonableness of an inference depends on common sense and the strength of competing explanations for the defendant's conduct. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786–87 (3d Cir. 2016); *Iqbal*, 556 U.S. at 681–82. Plaintiffs do not meet the plausibility burden when the facts alleged are "merely consistent with a defendant's liability" or show nothing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted). And in gauging the plausibility of a claim, the Court must accept as true all well-pleaded factual allegations, construe those facts in the light most favorable to the plaintiff, and draw reasonable inferences from them. *Connelly*, 809 F.3d at 786 n.2.

III

A

Velazquez first alleges the detectives fabricated the statements by Rafael, Jonathon and Quiles. The Due Process Clause of the Fourteenth Amendment prohibits police officers from fabricating evidence. *Halsey v. Pfeiffer*, 750 F.3d 273, 292 (3d Cir. 2014). To state a claim for fabrication of evidence, Velazquez must show (1) the defendants formulated or submitted false evidence, *Mervilus v. Union County*, 73 F.4th 185, 194–95 (3d Cir. 2023), and (2) a reasonable likelihood that, without the use of that

evidence, he would not have been convicted, *Halsey*, 750 F.3d at 294. The detectives challenge only the sufficiency of the first element.

To succeed, Velazquez must show the defendants formulated or submitted evidence they knew to be false, or at least with a reckless disregard for the truth. *Mervilus*, 73 F.4th at 194–95. A police officer recklessly disregards the truth when, accepting the facts in the complaint as true, he "must have entertained serious doubts as to the truth of [the evidence] or had obvious reasons to doubt the accuracy of the information." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (internal quotation marks and citation omitted); *Mervilus*, 73. F.4th at 194 (citing *Wilson* for the proposition that fabrication of evidence claims may be proven using a reckless disregard standard).

Velazquez alleges sufficient facts to show Sierra, Gaul, Verrecchio, Byard and Lucke formulated or submitted the statements by Rafael, Jonathon and Quiles with a reckless disregard for the truth. To start, Sierra "repeatedly" told Rafael that Velazquez killed Rivera and showed him a picture of Velazquez. (Am. Compl. ¶ 36.) Rafael objected, "repeatedly" saying he didn't know Velazquez and had never seen him. (*Id.*) He said he saw the shooter and that the shooter was someone other than Velazquez. (*Id.*) Sierra then offered to help Rafael with his open drug cases but only if he implicated Velazquez. (*Id.*) At this point, Rafael agreed and said Velazquez killed Rivera. (*Id.*) Taken as true, these allegations permit the reasonable inference that Sierra had obvious reasons to doubt the truth of Rafael's statement. *Wilson*, 212 F.3d at 788.

Next, Jonathon told Gaul and Verrecchio he didn't know who killed Rivera, but the detectives threatened to charge Jonathon with Rivera's murder "if he did not give a statement corroborating the statement of Rafael . . . which named Velazquez as the shooter." (Am. Compl. ¶¶ 56–57.) The detectives further told Jonathon he could not leave the station until he signed a statement identifying Velazquez. *See* (*id.* ¶ 57). After an eighteen-hour interview, Jonathon signed a statement implicating Velazquez. (*Id.* ¶ 59.) Given that (1) Jonathon said he didn't know who killed Rivera but (2) identified Velazquez only after Gaul and Verrecchio threatened to charge him with Rivera's murder if he didn't implicate Velazquez, the detectives had obvious reasons to doubt the truth of Jonathon's statement. *Wilson*, 212 F.3d at 788.

Lastly, Quiles "repeatedly" told Byard and Lucke she couldn't see Rivera's killer because it was too dark outside. (Am. Compl. ¶ 67.) The detectives showed her a set of photographs—which included a picture of Velazquez—and told her to identify one of them as the killer. (*Id.* ¶ 68.) Quiles continued to protest she never saw the killer's face. (*Id.*) She allegedly never selected the photograph of Velazquez, but signed an identification of him because the detectives forced her to do so. (*Id.* ¶ 90.) Again, taken as true, these allegations permit the reasonable inference that Byard and Lucke had obvious reasons to doubt the truth of Quiles's statement. *Wilson*, 212 F.3d at 788.

Velazquez fails to allege sufficient facts, however, to show Holmes, Clark or Wilkins fabricated evidence. He alleges Holmes led the Rivera investigation and that Sierra interviewed Rafael "under the supervision of and in consultation with" Holmes. (Am. Compl. ¶ 35.) But these allegations don't permit the inference Holmes fabricated evidence. Velazquez alleges Clark knew "of the fabricated basis for [Velazquez's] arrest

7

warrant." (*Id.* ¶ 76.)  But this allegation is too conclusory to suggest Clark fabricated evidence.  And finally, Velazquez characterizes his Amended Complaint as stating Wilkins directed "the preparation of an arrest warrant affidavit based on false evidence."  (Resp. in Opp'n to Mot. to Dismiss at 16, Dkt. No. 20.)  But again, this does not permit the inference Wilkins formulated or submitted evidence knowing it was false or with a reckless disregard for the truth.

B

Velazquez next alleges the defendants withheld evidence.  A criminal defendant suffers a due process violation when the prosecution fails to turn over favorable evidence that would materially aid in his defense.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Police officers can be liable for a *Brady* violation by failing to disclose such evidence to the prosecution.  *See Gibson v. Superintendent of N.J. Dep't of L. and Pub. Safety-Div. of State Police*, 411 F.3d 427, 443 (3d Cir. 2005); *Yarris v. County of Delaware*, 465 F.3d 129, 141 (3d Cir. 2006).  To state a *Brady* claim, Velazquez must show: (1) the detectives suppressed relevant evidence, (2) the evidence was favorable to him and (3) there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Velazquez alleges sufficient facts to state *Brady* claims against Sierra, Gaul, Verrecchio, Byard and Lucke. [2]  To start, he pleads facts to suggest the detectives

---

[2]    Velazquez fails to allege sufficient facts to show  Holmes, Clark or Wilkins withheld evidence.  Again, he alleges Holmes led the Rivera investigation and that Sierra interviewed Rafael "under the supervision of and in consultation with" Holmes.  (Am. Compl. ¶ 35.)  He says Clark knew the statements by Rafael, Jonathon and Quiles were fabricated.  (*Id.* ¶ 76.)  And he characterizes his Amended Complaint as saying Wilkins directed "the preparation of an arrest warrant affidavit based

suppressed relevant and favorable evidence. *Strickler*, 527 U.S. at 281–82. Police officers can suppress this kind of evidence by failing to turn over to the prosecution the "extent of their impermissible law enforcement tactics." *Gibson*, 411 F.3d at 443; *see also Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) (explaining *Brady* requires police officers to disclose the improper tactics they use to obtain a witness statement). Velazquez alleges Sierra, Gaul, Verrecchio, Byard and Lucke failed to disclose the impermissible tactics they used to obtain the statements by Rafael, Jonathon and Quiles—namely, that Sierra told Rafael he would help him with his drug cases if he identified Velazquez, that Gaul and Verrecchio told Jonathon they would charge him with Rivera's murder if he did not identify Velazquez and that Byard and Lucke forced Quiles to identify Velazquez. These allegations, taken as true, permit the reasonable inference the detectives failed to disclose the impermissible law enforcement tactics they used to obtain the statements at issue. *See Gibson*, 411 F.3d at 443; *see also Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017) (allowing a *Brady* claim to proceed to trial where officers failed to disclose the circumstances surrounding the statements of prosecution witnesses, namely the "details of the . . . inducements they brought to bear to extract false statements").

The detectives argue Velazquez fails to allege *Brady* materiality. To satisfy this requirement, he must show a reasonable probability the outcome of his trial would have been different had the evidence been disclosed. *Strickler*, 527 U.S. at 281–82. "Suppressed evidence that would be cumulative of other evidence . . . is generally not

---

on false evidence." (Resp. in Opp'n to Defs.' Mot. to Dismiss at 16.) But these allegations are too conclusory to show Holmes, Clark or Wilkins withheld evidence from the prosecution.

considered material for *Brady* purposes." *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013). The detectives say Rafael, Jonathon and Quiles recanted at trial their statements to the police and claimed the police fabricated the statements implicating Velazquez. *See* (Am. Compl. ¶ 87) ("Each of the witnesses recanted . . . at trial, claiming coercion and fabrication."). Because the jury heard the witness statements were fabricated and still convicted Velazquez, they conclude, the detectives' use of impermissible law enforcement tactics was cumulative of evidence already presented at trial, and therefore, not material. In response, Velazquez argues "the relevant evidence was [not] presented to the jury"; rather, he says, he did not learn the precise nature of the detectives' impermissible tactics until after trial. (Resp. in Opp'n to Defs.' Mot. to Dismiss at 20–21.)

Velazquez's Amended Complaint supports his argument, if barely. For example, he alleges that "all" of the impermissible law enforcement tactics described above were "concealed . . . preventing him from utilizing [the evidence] at trial." (Am. Compl. ¶ 27.) More specifically, he alleges that after trial he learned of "new" evidence including (1) Rafael told Sierra he saw someone other than Velazquez kill Rivera and Sierra said he would help Rafael with his drug cases if he identified Velazquez and (2) Gaul and Verrecchio told Jonathon they would charge him with Rivera's murder unless he corroborated Rafael's statement. (*Id.* ¶ 117.) This evidence would have significantly undermined Rafael's and Jonathon's statements and, at the same time, supported Quiles's testimony at trial that the detectives fabricated her identification of Velazquez. *See Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017). Thus, at

10

least at this stage of the proceedings, Velazquez alleges sufficient facts to show materiality.³

C

Velazquez next alleges the defendants maliciously prosecuted him under the Fourth Amendment to the U.S. Constitution and Pennsylvania law. To state a claim for malicious prosecution under the Fourth Amendment, Velazquez must show (1) the defendants initiated a criminal proceeding, (2) they did so without probable cause, (3) they acted maliciously or for a purpose other than bringing him to justice, (4) he was seized and (5) the criminal proceeding ended in his favor. *Halsey*, 750 F.3d at 296–97. The detectives challenge only the first element.

Velazquez alleges sufficient facts to show Sierra, Gaul, Verrecchio, Byard and Lucke initiated a criminal proceeding.⁴ A detective may be held responsible for initiating a criminal proceeding if he provides fabricated evidence to, or conceals material information from, prosecutors. *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.2 (3d Cir. 1998). The detectives must have "influenced" the "decision" to initiate the proceedings. *Halsey*, 750 F.3d at 297; *see also* 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 3.18[A] (4th ed. 2024) (explaining the fabricated

---

³ The detectives' argument here may also implicate *Brady*'s suppression element. The Third Circuit Court of Appeals has held that when the government is aware that defense counsel has in its possession the allegedly exculpatory material, that material has not been suppressed within the meaning of *Brady*. *See Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 292 (3d Cir. 2016) (en banc). If discovery reveals the jury heard testimony regarding the alleged impermissible law enforcement tactics used by the detectives to obtain the statements at issue, there may be a question as to whether this material was suppressed.

⁴ Velazquez fails to allege sufficient facts to show Holmes, Clark or Wilkins maliciously prosecuted him. As already explained, he fails to allege sufficient facts to show they fabricated evidence against him or withheld evidence from his defense. Because Velazquez ties his malicious prosecution claim to his fabrication of evidence and *Brady* claims, he fails to state claims against Holmes, Clark and Wilkins.

evidence or concealed material facts must have had "a significant impact on the decision to prosecute"). As explained, Velazquez alleges sufficient facts to permit the inference the detectives provided fabricated evidence to, and withheld material information from, prosecutors. And the statements by Rafael, Jonathon and Quiles were used to convince the chief of the homicide unit at the District Attorney's Office to seek an arrest warrant. (Am. Compl. ¶ 70.) Thus, Velazquez plausibly alleges the detectives played a significant role in the decision to prosecute. *See Halsey*, 750 F.3d at 297 n.22.

Velazquez's malicious prosecution claim under Pennsylvania law suffices at this stage for similar reasons. He must show (1) the defendants initiated a criminal proceeding, (2) they did so without probable cause, (3) they acted maliciously or for a purpose other than bringing him to justice and (4) the criminal proceeding ended in his favor. *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Loc. Union 249*, 544 A.2d 940, 941 (Pa. 1988). As explained, Velazquez alleges sufficient facts to satisfy the first element. And the detectives do not challenge the sufficiency of the remaining elements.

D

Velazquez next argues the defendants conspired to violate his civil rights under § 1983 and Pennsylvania law. To state a claim for conspiracy under § 1983, Velazquez must show (1) two or more persons agreed to deprive him of a constitutional right, (2) one or more of the conspirators performed an overt act in furtherance of the conspiracy and (3) the overt act deprived him of a constitutional right. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018). Velazquez primarily

claims the detectives conspired to fabricate evidence and maliciously prosecute him. And the detectives respond Velazquez fails to satisfy the first element: an agreement.

To show agreement, Velazquez must allege the "state actors named as defendants" in the "complaint somehow reached an understanding to" violate his rights. *Id.* at 295 (internal quotation marks and citation omitted). Direct evidence is not required; circumstantial proof is enough. *Id.* Circumstantial evidence of an agreement includes allegations that the conspirators "did or said something" to create an understanding, or allegations about the time the agreement was made, the parties to the agreement, and the object of the conspiracy. *Id.* (internal quotation marks and citation omitted). In the context of a conspiracy among police officers, agreement may manifest as conversations between officers about the incident, allegedly distorted stories that emerged, an awareness of conflicting stories and irregularities in the series of official investigations into the incident. *Id.* Material omissions in contemporaneous police reports can also show that officers "agreed to abide" by a claim "about what happened" and agreed to represent it falsely. *Id.* at 296 (internal quotation marks and citation omitted).

Velazquez alleges sufficient facts to plausibly show Sierra, Gaul, Verrecchio, Byard and Lucke agreed to fabricate evidence.[5] The detectives investigated Rivera's murder, and Velazquez alleges irregularities in the investigation that could indicate concerted activity to fabricate evidence and maliciously prosecute him. To begin, the detectives allegedly fabricated witness statements and shared information regarding

---

[5] Velazquez fails to allege sufficient facts to suggest Holmes, Clark and Wilkins reached an agreement to fabricate evidence or maliciously prosecute him. As explained, he fails to allege facts to suggest these officers fabricated evidence or maliciously prosecuted him. And his conspiracy allegations against them are conclusory.

the investigation. Sierra fabricated Rafael's statement and passed it to Nordo, who then arrested Jonathon. Gaul and Verrecchio told Jonathon they would charge him with Rivera's killing unless he "corroborat[ed] the statement of Rafael." (Am. Compl. ¶ 57.) After Rafael and Jonathon had identified Velazquez, Byard and Lucke interviewed Quiles and fabricated her identification of Velazquez. In addition, the detectives drafted police reports detailing their interviews of the witnesses but omitted the specific tactics they used to obtain their statements. And it is reasonable to infer the detectives shared these reports with each other. *See, e.g.*, (*id.* ¶¶ 48, 73). These allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence of" a conspiracy. *Bell Atl. Corp.*, 550 U.S. at 556.

To prove a conspiracy under Pennsylvania law, Velazquez must allege (1) two or more persons combined or agreed to do an unlawful act or to do an otherwise lawful act by unlawful means, (2) a conspirator performed an overt act in furtherance of the conspiracy and (3) legal damage. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). Because Velazquez alleges the detectives agreed to fabricate evidence, and because the detectives do not challenge the other elements, Velazquez's civil conspiracy claim under Pennsylvania law may proceed.

E

Finally, Velazquez seeks to hold Clark and Wilkins responsible for their subordinates' fabrication of evidence under a theory of supervisory liability. *See* (Resp. in Opp'n to Defs.' Mot. to Dismiss at 25). Section 1983 does not impose vicarious liability on supervisors for their subordinates' actions. *See Iqbal*, 556 U.S. at 676. A "government official is liable only for his or own conduct and accordingly must have

14

some sort of personal involvement in the alleged unconstitutional conduct." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 71 (3d Cir. 2011).  Thus, a supervisor may be liable if he violated the plaintiff's rights, directed others to violate them, or had knowledge of and acquiesced in his subordinates' unconstitutional conduct.  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).  A supervisor may also be liable if he maintained a policy, practice or custom that directly caused a constitutional violation.  *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016).

      Velazquez does not satisfy either theory of supervisory liability.  First, he fails to allege sufficient facts to suggest Clark or Wilkins violated his rights, directed others to violate them, or had knowledge of and acquiesced in his subordinates' unconstitutional conduct.  *A.M. ex rel. J.M.K.*, 372 F.3d at 586.  To begin, no allegation permits the inference Clark or Wilkins participated in the interviews of Rafael, Jonathon or Quiles, so nothing could show they fabricated their statements.  Next, Velazquez fails to adequately allege Clark or Wilkins directed their subordinates to fabricate evidence.  He says Clark and Wilkins told the detectives to use any means necessary to close the Rivera case and encouraged or agreed to the interview techniques used by the detectives.  (Am. Compl. ¶ 29.)  But these allegations are too conclusory to show Clark or Wilkins instructed the detectives to *fabricate* evidence.  *See Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).  And finally, Velazquez fails to allege Clark or Wilkins knew of their subordinates' fabrication of evidence and acquiesced in it.  He alleges Clark was "aware" of the "fabricated" evidence and says Wilkins presented the fabricated evidence to the chief of the homicide unit at the District Attorney's Office.  (Am. Compl. ¶¶ 70, 76.)  But these allegations are conclusory.  In response, Velazquez

emphasizes that Clark and Wilkins were "supervisors of the [Rivera] investigation." (Resp. in Opp'n to Defs.' Mot. to Dismiss at 25–26.) But supervisory liability does not attach based solely on job title.

Second, Velazquez fails to allege sufficient facts to show Clark or Wilkins maintained a policy, practice or custom that directly caused his constitutional harm. *Parkell*, 833 F.3d at 330. This requires him to show the officials "established or enforced policies and practices causing the constitutional violation." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 223 (3d Cir. 2015). Velazquez broadly asserts Clark and Wilkins "maintained a . . . custom" of "fabricat[ing] false evidence." (Resp. in Opp'n to Defs.' Mot. to Dismiss at 26.) He says they encouraged their subordinates to fabricate evidence and instructed them to use any means necessary to close cases. (Am. Compl. ¶¶ 29, 130.) But again, these allegations are conclusory failing to show Clark or Wilkins established or enforced a policy or practice of fabricating evidence causing Velazquez's constitutional injury.[6]

## IV

A court should grant a plaintiff leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). If a civil-rights complaint fails to state a claim, a court must grant leave to amend unless amendment would be futile or inequitable. *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018). Amendment is futile if no new facts could fix the complaint's problems. *Jablonski v. Pan Am. World Airways,*

---

[6] Velazquez also asserts Wilkins fabricated evidence in another murder investigation. But his Amended Complaint does not clearly identify the actions taken by Wilkins in this case. For example, he says Nordo, "with the blessing of" Wilkins, forced a suspect to falsely implicate himself in a murder. (Am. Compl. ¶ 154.) He also says Nordo, "together with" Wilkins, used coercive tactics to get a witness to falsely implicate a suspect in this case. (*Id.*)

16

*Inc.*, 863 F.2d 289, 292 (3d Cir. 1988).  And amendment is inequitable if the plaintiff unduly delays, shows bad faith, or if amendment would unfairly prejudice the defendant.  *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

Velazquez already amended his Complaint once and does not move to amend again.  But the Court will allow Velazquez to file a second amended complaint because amendment would be neither futile nor inequitable.  He could allege facts to fix the problems identified in this Memorandum and he hasn't shown bad faith.  Finally, amendment wouldn't prejudice the detectives.  If Velazquez amends, they will have to defend against the same claims, just based on new facts.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.