**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NEFTALI VELAZQUEZ, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 25-3720 |
| CITY OF PHILADELPHIA, et al., | |
| *Defendants.* | |

**Pappert, J.**                                                                                                  **May 13, 2026**

**<u>MEMORANDUM</u>**

Neftali Velazquez sued (among others) Assistant District Attorney Nicholas Liermann and the Philadelphia District Attorney's Office for allegedly violating his civil rights.  Liermann and the District Attorney's Office move to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6).  The Court grants their motion in part and denies it in part.

I

Shortly before eleven o'clock on the night of October 17, 2012, someone shot and killed Domingo Rivera in front of a bar in West Kensington.  (Second Am. Compl. ¶ 18, Dkt. No. 30.)  As Philadelphia detectives investigated the killing, they interviewed three key witnesses—Rafael Rodriquez, Jonathon Rodriquez and Wendy Quiles—each of whom said Velazquez killed Rivera.  (*Id.* ¶ 25.)  Velazquez alleges, however, the detectives fabricated their statements, leading to his prosecution without probable cause.  (*Id.*)

A little over a week after Rivera was killed, a police officer arrested Rafael, who had two open bench warrants for drug violations.  (*Id.* ¶ 29.)  Rafael told the officer he

1

had information regarding Rivera's murder, (*id.* ¶ 31), so the officer took him to homicide detectives, (*id.* ¶ 32).  Detective William Sierra interviewed Rafael.  (*Id.* ¶ 37.)  Sierra told Rafael that Velazquez was the shooter and showed him a picture of Velazquez.  (*Id.*)  Rafael replied he didn't know Velazquez and had never seen him.  (*Id.*)  Rafael said the shooter was someone other than Velazquez.  (*Id.*)  At this point, Sierra allegedly offered to help Rafael with his open drug cases if he would falsely identify Velazquez as the shooter.  (*Id.*)  Rafael agreed.  (*Id.*)

The detectives next sought to speak with Jonathon, who Rafael had said was at the scene of Rivera's killing.  (*Id.* ¶ 49.)  Detective Philip Nordo arrested Jonathon, falsely telling him he was being detained for a probation violation.  (*Id.* ¶¶ 50, 52.)  Detectives Thomas Gaul and John Verrecchio interviewed Jonathon, (*id.* ¶ 55), who said he didn't see who shot and killed Rivera, (*id.* ¶ 57).  Gaul and Verrecchio then allegedly told Jonathon that if he did not identify Velazquez, they would charge him with Rivera's murder.  (*Id.* ¶¶ 57–58.)  They said Jonathon could not leave the station until he identified Velazquez.  (*Id.* ¶ 58.)  Following this, Jonathon signed a statement identifying Velazquez as Rivera's killer.  (*Id.* ¶ 60.)

Soon after Rivera's killing, the police also interviewed Quiles.  She was smoking with Rivera outside the bar when he was killed, but couldn't see the shooter because it was too dark.  (*Id.* ¶ 64.)  She gave a generic description of Rivera's killer emphasizing she didn't see his face.  (*Id.* ¶ 66.)  Then, after Rafael and Jonathon had implicated Velazquez, detectives questioned Quiles again.  (*Id.* ¶ 67.)  Detectives Tracy Byard and Thorsten Lucke interviewed her.  (*Id.* ¶ 68.)  She again said she didn't see the shooter because it was too dark.  (*Id.* ¶ 69.)  Byard and Lucke then showed Quiles a set of

2

photographs—which included a picture of Velazquez—and told her to identify one of the photos as the killer. (*Id.* ¶ 70.) Quiles never actually identified Velazquez; the officers forced her to sign his photo. (*Id.* ¶ 71.)

In March of 2013, a sergeant presented the statements by Rafael, Jonathon and Quiles to the chief of the homicide unit in the District Attorney's Office, who instructed him to seek an arrest warrant. (*Id.* ¶ 72.) Gaul signed a probable-cause affidavit predicated solely on Jonathon's statement identifying Velazquez as the shooter. (*Id.* ¶ 74.) A magistrate judge issued a warrant and Velazquez was arrested in April of 2013. (*Id.* ¶¶ 76–77.)

Six months after Velazquez's arrest, Assistant District Attorney Nicholas Liermann and a detective from the District Attorney's Office interviewed Quiles. (*Id.* ¶ 80.) Quiles told Liermann that she did not see the shooter's face and could not identify him. (*Id.*) She further explained the detectives had forced her to identify Velazquez. (*Id.*) She also gave Liermann a sketch of the crime scene. (*Id.*) Liermann told Velazquez's trial prosecutor, Assistant District Attorney Brett Furber, everything Quiles said during her interview. (*Id.*) In fact, Liermann "created two written accounts of his . . . interview with Quiles detailing her statements that she had not seen the shooter's face and could not make an identification and that she had been pressured by the detectives to make an identification." (*Id.* ¶ 82.) The District Attorney's Office, however, did not turn over Liermann's memos to Velazquez before trial. (*Id.*) And Liermann allegedly played a role in "conceal[ing] the exculpatory truth from Velazquez." (*Id.* ¶ 85.) He did not tell Velazquez's defense what Quiles said during her interview. (*Id.*) He also allegedly fabricated a narrative to the defense that Quiles did

3

not want to identify Velazquez at trial.  (*Id.* ¶¶ 81, 84); *see also* (*id.* at 1–2) (accusing

Liermann of "eliciting exculpatory information from a witness and then providing the

defense with a materially false witness statement that omitted exculpatory information

he elicited").

At trial, the prosecution relied on the statements by Rafael, Jonathon and

Quiles.  (*Id.* ¶ 87.)  Each of these witnesses recanted on the stand and said their

identifications of Velazquez had been fabricated.  (*Id.* ¶ 89.)  On January 25, 2016, the

jury convicted Velazquez of first-degree murder and possessing an instrument of crime.

(*Id.* ¶ 117.)  He was sentenced to life in prison.  (*Id.*)  Six years later, Velazquez's

sentence was vacated and he received a new trial.  (*Id.* ¶ 121.)  The District Attorney's

Office then moved to dismiss his case, and the Court of Common Pleas granted the

motion.  (*Id.* ¶ 125.)

## II

The Court assesses the sufficiency of a pleading before discovery under Federal

Rules of Civil Procedure 8 and 12.  Rule 8(a)(2) provides that a complaint "must contain

. . . a short and plain statement of the claim showing that the pleader is entitled to

relief."  Fed. R. Civ. P. 8(a)(2).  And Rule 12(b)(6) permits a district court to dismiss a

complaint that fails "to state a claim upon which relief can be granted."  *Id.* 12(b)(6).

Taken together, the two rules require a plaintiff to allege sufficient "facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  The first step in determining whether a plaintiff has stated a plausible

claim is to "tak[e] note of the elements" underlying her claim.  *Ashcroft v. Iqbal*, 556

U.S. 662, 675 (2009); *Santiago v. Warminster Township*, 629 F.3d 121, 129–30 (3d Cir.

2010).  The second step is to examine the plaintiff's complaint and determine whether the factual allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

Plausibility requires the plaintiff to plead sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The reasonableness of an inference depends on common sense and the strength of competing explanations for the defendant's conduct.  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786–87 (3d Cir. 2016); *Iqbal*, 556 U.S. at 682.  Plaintiffs do not meet the plausibility burden when the facts alleged are "merely consistent with a defendant's liability" or show nothing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  In gauging the plausibility of a claim, the Court must accept as true all well-pleaded factual allegations, construe those facts in the light most favorable to the plaintiff, and draw reasonable inferences from them.  *Connelly*, 809 F.3d at 786 n.2.

III

A

Velazquez claims Liermann violated his due process rights by fabricating evidence.  Absolute immunity shields Liermann from such a claim.

Section 1983 incorporates certain immunities that were well-established in 1871 when the statute was enacted.  *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976).  These immunities include absolute immunity for prosecutors in carrying out their official duties.  *Id.* at 422–23.  This defense ensures prosecutors "can perform their respective functions without harassment or intimidation," *Butz v. Economou*, 438 U.S. 478, 512

5

(1978), or without the "constant dread of retaliation," *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).

A two-step test governs whether absolute immunity applies. *Schneyder v. Smith*, 653 F.3d 313, 332 (3d Cir. 2011). First, the Court must define the "conduct [that] forms the basis for the plaintiff's cause of action." *Id.* The prosecutor's action(s) must be defined "carefully" at a reasonably particularized level of generality. *Odd v. Malone*, 538 F.3d 202, 212–13 (3d Cir. 2008). Second, the Court must determine whether the prosecutor was functioning in a judicial capacity when performing the action(s) in question. *Yarris v. County of Delaware*, 465 F.3d 129, 135–36 (3d Cir. 2006). This inquiry focuses on the "nature of the function performed." *Light v. Haws*, 472 F.3d 74, 78 (3d Cir. 2007) (citation omitted). Under this approach, a prosecutor enjoys absolute immunity for actions performed as the state's advocate. *Odd*, 538 F.3d at 208. Thus, immunity attaches to actions "intimately associated with the judicial phases of litigation," but not to investigatory actions unrelated to initiating, preparing and conducting judicial proceedings. *Id.* (citation omitted).

1

Velazquez contends Liermann withheld from the defense information he obtained during a trial preparation interview with a detective-identified witness to Rivera's murder and also created a false narrative about this interview. Soon after Rivera's killing, detectives interviewed Quiles twice because she was smoking with Rivera outside the bar when he was killed. (Second Am. Compl. ¶¶ 64–68.) After Quiles implicated Velazquez, (*id.* ¶¶ 67–71), detectives secured an arrest warrant based on a probable-cause affidavit, (*id.* ¶¶ 76–77). Six months later, Liermann interviewed

Quiles, (*id.* ¶ 80), during which Quiles said she did not see the shooter's face and could not identify him, (*id.*).  She further said the detectives had forced her to identify Velazquez, and she provided Liermann a sketch of the crime scene.  (*Id.*)  Liermann told Velazquez's trial prosecutor everything Quiles said during her interview.  (*Id.* ¶ 81.)  He "created two written accounts of his . . . interview with Quiles detailing her statements that she had not seen the shooter's face and could not make an identification and that she had been pressured by the detectives to make an identification," which he gave to the trial prosecutor.  (*Id.* ¶¶ 82, 86, 97.)  Liermann, however, "suppressed" the substance of Quiles's interview "from the defense."  (*Id.* ¶ 81); *see also* (*id.* ¶ 82) (alleging Liermann failed to turn over "exculpatory information").  He also "curat[ed]" a false narrative to the defense that Quiles merely didn't want to identify Velazquez at trial.  (*Id.* ¶ 84); *see also* (*id.* at 1–2) (accusing Liermann of "eliciting exculpatory information from a witness and then providing the defense with a materially false witness statement that omitted exculpatory information he elicited").

2

Liermann was functioning as the state's advocate when he allegedly withheld the substance of Quiles's interview from Velazquez's defense and created a false narrative about it.  Liermann did not search for and identify Quiles as a witness, nor did he elicit her initial statement.  *Smith v. County of Wayne*, 147 F.4th 613, 623 (6th Cir. 2025).  Rather, homicide detectives identified Quiles because she was with Rivera when he was killed, interviewed her twice and obtained a statement from her implicating Velazquez.  (Second Am. Compl. ¶¶ 63–71.)  Nor did Liermann interview

7

Quiles to establish probable cause to arrest Velazquez. *Yarris*, 465 F.3d at 139. After Quiles implicated Velazquez, detectives obtained a warrant for his arrest based on a probable-cause affidavit. (*Id.* ¶¶ 76–77.) Liermann interviewed Quiles after Velazquez was charged but before he was tried—the "period" in which "prosecutors are most likely functioning" as advocates. *Odd*, 538 F.3d at 211; *Kulwicki v. Dawson*, 969 F.2d 1454, 1465 (3d Cir. 1992). In fact, Velazquez's allegations confirm Liermann interviewed Quiles to prepare for trial. He told Velazquez's trial prosecutor everything Quiles said, creating two written memos for him, (Second Am. Compl. ¶ 81), and the trial prosecutor used information gathered during the interview at trial, (*id.* ¶¶ 91–100). Because Liermann "served the core advocacy role of meeting with a witness the police had already identified to prepare" for "upcoming trial," absolute immunity shields him for allegedly withholding and fabricating evidence he obtained during Quiles's interview. *Smith*, 147 F.4th at 623; *see id.* at 620 (holding absolute immunity shields a prosecutor if he incidentally develops new evidence when evaluating evidence already gathered by law enforcement in preparation for an upcoming trial); *see also Yarris*, 465 F.3d at 137 (absolute immunity shields a prosecutor for intentionally concealing exculpatory evidence prior to trial); *Price v. Montgomery County*, 72 F.4th 711, 720 (6th Cir. 2023) (absolute immunity shields a prosecutor's "[c]ommunication[s]" with a "key witness" before trial even if he instructs the witness to destroy evidence); *Cousin v. Small*, 325 F.3d 627, 635 (5th Cir. 2003) (per curiam) (absolute immunity shields a prosecutor when he "secure[s] evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause").

Velazquez relies in response on three decisions which hurt rather than help him. In *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), Stephen Buckley was arrested and tried for killing an eleven-year-old. *Id.* at 261. After a third party confessed to the murder, Buckley sued State Attorney Michael Fitzsimmons claiming he fabricated evidence to obtain the indictment. *Id.* at 264, 272. The Supreme Court held Fitzsimmons was not entitled to absolute immunity because at the time he allegedly fabricated the evidence, Fitzsimmons had no probable cause to arrest Buckley, no indictment had issued and no judicial proceedings had begun. *Id.* at 275–76. Because Fitzsimmons's actions "occurred well before" he "could properly claim to be acting as [an] advocate[]," his actions were purely investigative in nature. *Id.* at 275. Unlike Fitzsimmons, however, Liermann engaged in the conduct at issue after Velazquez was charged but before he was tried—again, the "period" in which "prosecutors are most likely functioning" as advocates. *Odd*, 538 F.3d at 211.

In *Fogle v. Sokol*, 957 F.3d 148 (3d Cir. 2020), Lewis Fogle was convicted of second-degree murder. *Id.* at 155. After his conviction was vacated, he sued Indiana County District Attorney Gregory Olson claiming he fabricated evidence. *Id.* Most relevant here, the Third Circuit Court of Appeals held Olson was not entitled to absolute immunity because he arranged for an English teacher to hypnotize a witness and then after the witness was hypnotized, Olson obtained a statement from him implicating Fogle, which he used to establish "probable cause" for Fogle's arrest. *Id.* at 161–62. Liermann's alleged conduct is far different than what Olson did. He did not search for and identify a third party to help him coerce a witness to establish probable cause during an ongoing murder investigation. *Id.* Instead, he interviewed a witness

police had identified and obtained a statement from in preparation for an upcoming trial.

In *Roberts v. Lau*, 90 F.4th 618 (3d Cir. 2024), Larry Roberts was convicted of killing Duwan Stern. *Id.* at 622. After he was retried and acquitted, he sued Assistant District Attorney John Baer claiming he fabricated evidence. *Id.* at 620. The Third Circuit held Baer was not entitled to absolute immunity because he "embarked on a post-charge search for a new witness to plug a hole in the prosecution's case." *Id.* at 623. A police officer had obtained a probable-cause affidavit to arrest Roberts based on a "contaminated" identification. *Id.* at 621. But the officer could not ascribe to Roberts a motive for killing Stern, so he sought help from Baer. *Id.* at 622. Baer "affirmatively searched for and approached a new witness," a jailhouse informant, "to establish motive." *Id.* at 620, 622. Baer knew this jailhouse informant was not credible because he had been convicted of lying to police and was a drug addict. *Id.* at 622. Undeterred, Baer convinced the informant to concoct a story that Roberts killed Stern over drugs. *Id.* The Third Circuit held Baer's actions were investigative because he "went looking for a new" witness (a jailhouse informant), "found" one, "approached" him, and "knowingly influenced, enticed and coerced" him to provide false testimony to support the prosecution's case. *Id.* at 630. In so ruling, the Third Circuit "distinguish[ed]" these facts from a "different situation where a prosecutor . . . interview[s] and meet[s] a previously unknown witness who has been located and identified by investigators." *Id.* at 628. Liermann's conduct is unlike Baer's. He did not "affirmatively search[] for and approach[] a new witness." *Id.* at 620; *see id.* at 628 n.7 (holding "it was Baer's alleged search for a new witness that served an investigative function"). He interviewed and

10

met a witness police had located, identified and already obtained a statement from.  *Id.* at 628.

3

Two "policy considerations underlying prosecutorial immunity" favor Liermann. *Odd*, 538 F.3d at 216.  To begin, denying absolute immunity in this case would interfere with prosecutors' independent judgment by exposing them to vexatious litigation.  *Id.* Again, Velazquez claims Liermann withheld information he obtained during a trial preparation interview and fabricated a narrative about this interview.  But these kind of allegations target a prosecutor's independent judgment during the judicial phase of litigation.  "Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation."  *Imbler*, 424 U.S. at 425.  Forcing prosecutors to defend these decisions—such as what a witness said during a pre-trial interview—"often years after they were made" would "impose unique and intolerable burdens upon a prosecutor responsible annually" for several trials.  *Id.* at 425–26.

Next, there are alternatives other than individual suits against prosecutors to redress the kind of alleged prosecutorial abuse in this case.  *Odd*, 538 F.3d at 217.  The "judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for damages actions to prevent unjust results." *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985).  State and federal post-conviction collateral remedies provide plaintiffs like Velazquez a "means of redressing" a prosecutor's suppression and fabrication of evidence he obtained during a trial preparation interview.  *Kulwicki*, 969 F.2d at 1463.  In fact, such remedies worked here.

11

During post-conviction proceedings, Velazquez discovered (among other things) "[t]he portion of Wendy Quiles'[s] October 17, 2014 statement [taken by Liermann] where she states that she was unable to see the gunman's face during the course of the shooting." (Second Am. Compl. ¶ 119.)  And this evidence (or other) led to his conviction being vacated. *See* (*id.* ¶¶ 120–21).  In short, the "[v]arious post-trial procedures" "available to determine whether an accused has received a fair trial"—which worked in this case—counsel in favor of granting absolute immunity to Liermann.  *Imbler*, 424 U.S. at 427.

B

Velazquez also claims the Philadelphia District Attorney's Office maintained various customs leading to his prosecution without probable cause.  Section 1983 does not allow plaintiffs to hold local government units automatically liable for the unlawful actions of its employees under a theory of vicarious liability.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  Plaintiffs can hold local government units liable "only for their *own* illegal acts."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation omitted).  When a local officer harms a private party, therefore, that party must connect the officer's conduct to a local policy or custom.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

The defendants argue the Philadelphia District Attorney's Office is "not a[] [suable] entity for purposes of § 1983 liability," (Defs.' Mem. of L. In Supp. of Mot. to Dismiss at 13, Dkt. No. 32-1), relying on *Reitz v. County of Bucks*, 125 F.3d 139 (3d Cir. 1997).  There a plaintiff sued the Bucks County District Attorney's Office under 42 U.S.C. § 1983 alleging it maintained an unofficial custom of failing to adequately train prosecutors.  *Id.* at 145.  The District Court rejected this claim, holding—without citing

12

anything—"[t]he Bucks County District Attorney's Office is not a legal entity for the purpose of § 1983 liability." *Reitz v. County of Bucks*, No. 95-6603, 1996 WL 530021, at *2 (E.D. Pa. Sep. 17, 1996). The Third Circuit affirmed the District Court's judgment. "[A]ccepting plaintiff's proposition that the District Attorney's Office is a separate entity" from Bucks County, the Third Circuit held, "the plaintiffs have presented no evidence of any actionable custom." *Reitz*, 125 F.3d at 145. Then, at the end of its opinion, in "recapitulat[ing]" its reasoning, the Third Circuit said, among other things, "the Bucks County District Attorney's Office is not an entity for purposes of § 1983 liability." *Id.* at 148.

In unpublished decisions, the Third Circuit has cited *Reitz* for the proposition that a district attorney's office in Pennsylvania cannot be sued under § 1983 because it is not separate from the county in which it sits. *See e.g.*, *Fake v. Pennsylvania*, No. 25-1798, 2025 WL 2741856, at *2 (3d Cir. Sep. 26, 2025) (per curiam) (citing *Reitz* for the proposition that "the Philadelphia District Attorney's Office is not a separate entity that can be sued under § 1983"); *Ellakkany v. Common Pleas Ct. of Montgomery Cnty.*, 658 F. App'x 25, 28 (3d Cir. 2016) (per curiam) (holding the "District Attorney's Office of Montgomery County" is not "separate from the municipality itself").[1] In other unpublished decisions, the Third Circuit has entertained lawsuits against Pennsylvania district attorneys' offices on the merits. *See, e.g.*, *Garcia v. Phila. Dist. Att'y's Off.*, No. 23-1224, 2023 WL 3750604, at *2 (3d Cir. June 1, 2023) (per curiam). In light of this, district courts in the Third Circuit have understandably reached different conclusions

---

[1]    The Third Circuit has also cited *Reitz* for the proposition that a district attorney's office in *New Jersey* is not separate from the county in which it sits, and therefore, cannot be sued under § 1983. *See Briggs v. Moore*, 251 F. App'x 77, 79 (3d Cir. 2007) (explaining the "Monmouth County Prosecutor's Office is not a separate entity that can be sued under § 1983").

13

as to whether the Philadelphia District Attorney's Office may be sued under § 1983. *See Harper v. City of Philadelphia*, No. 18-cv-365, 2018 WL 5784549, at \*2 (E.D. Pa. Nov. 2, 2018) ("District courts within the Third Circuit disagree about whether the DAO is a separate entity from the City of Philadelphia such that it can be sued separately under § 1983.")

Under Federal Rule of Civil Procedure 17(b)(3), Pennsylvania law determines whether the Philadelphia District Attorney's Office has the capacity to be sued.  Fed. R. Civ. P. 17(b)(3); *see Dean v. Barber*, 951 F.2d 1210, 1214–15 (11th Cir. 1992) (asking in accordance with Federal Rule of Civil Procedure 17 whether a local government unit has the capacity to be sued under state law); *Streit v. County of Los Angeles*, 236 F.3d 552, 565 (9th Cir. 2001) (same); *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 393 (4th Cir. 2014) (same); *Mayfield v. Harvey Cnty. Sheriff's Dep't*, 732 F. App'x 685, 688 (10th Cir. 2018) (same).  *Reitz* did not cite anything to support its statement at the end of its opinion that the "Bucks County District Attorney's Office is not an entity for purposes of § 1983 liability."  *Reitz*, 125 F.3d at 148.  Nor does the District Attorney's Office cite any Pennsylvania law in support of its argument that it lacks the capacity to be sued because it is part of the City of Philadelphia.  *Cf. Moody v. City of Philadelphia*, 810 F. App'x 169, 172 (3d Cir. 2020) (per curiam) (concluding the Philadelphia Police Department and the Board of Licenses and Inspections are city departments and that under state law city departments are not separate legal entities from the city with the capacity to be sued).  Accordingly, at this stage, the District Attorney's Office has not carried its burden to show it lacks the capacity to be sued.  *Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694, 711–12 (E.D. Pa. 2015) (holding the Philadelphia

14

District Attorney's Office may be sued under § 1983 because it is not a department of the City of Philadelphia and defendant did not otherwise show it lacked the capacity to be sued under state law); *Quintana v. City of Philadelphia*, No. 17-996, 2017 WL 3116265, at *4 (E.D. Pa. July 21, 2017) (holding in accordance with *Sourovelis* the Philadelphia District Attorney's Office may be sued under § 1983, which the District Attorney's Office did not contest).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.